UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-80421-CIV-MATTHEWMAN

MARIA GUADALUPE DIAZ,

      Plaintiff,

v.



NANCY A. BERRYHILL[1],
Acting Commissioner of Social Security
Administration,

      Defendant.

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 26, 29]

**THIS CAUSE** is before the Court upon Plaintiff, Maria Guadalupe Diaz's ("Plaintiff"),

Motion for Summary Judgment with Supporting Memorandum of Law [DE 26], and Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security Administration's ("Defendant")

Motion for Summary Judgment with Supporting Memorandum of Law and Response to

Plaintiff's Motion for Summary Judgment [DE 29]. Plaintiff filed a Reply [DE 31] to

Defendant's Response. The parties have consented to magistrate judge jurisdiction. *See* DE

11. The issues before the Court are whether the record contains substantial evidence to support

the denial of benefits to Plaintiff and whether the correct legal standards have been applied.

*Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill, the new acting commissioner of Social Security, will be substituted as a party in this case. Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

1

# I. **FACTS**

On May 24, 2012, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, asserting a disability on-set date of March 14, 2012. [R. 15].[2] The application was denied initially and upon reconsideration. *Id.* Following a video hearing on April 17, 2014, Administrative Law Judge Charles Woode (the "ALJ") issued a decision on June 17, 2014, denying Plaintiff's request for benefits. [R. 12-28]. A request for review was filed with the Appeals Council and denied on January 27, 2016. [R. 1-8]. Plaintiff's date last insured was December 31, 2016. [R. 15].

## A. Hearing Testimony

The ALJ held a video hearing on April 17, 2014.[3] [R. 29-52]. Plaintiff stated that her date of birth was February 2, 1961, making her fifty-three years old at the time of the hearing. [R. 34]. She testified that she is married with four children and lives in a home with her husband and daughter. [R. 34-35]. Her children are ages 31, 30, 25, and 22. [R. 34]. Plaintiff stated that she has a driver's license and she drives about once a week. [R. 35]. According to Plaintiff, she graduated high school in Mexico and attended college in the United States for about two years. *Id.* She testified that she is able to read English, but is more limited in her ability to speak and write English. [R. 36].

Plaintiff testified that she worked in a food packaging company for two years as a food packer, and was also an assistant teacher in a daycare. [R. 37]. Plaintiff stated that she stopped working because of the accident that occurred on March 14, 2012, and has not worked since then. [R. 37-38]. Plaintiff testified that she has pain in her neck and shoulders, which

---

[2] All references are to the record of the administrative proceeding filed by the Commissioner in Docket Entry 17.
[3] Plaintiff was assisted by a Spanish/English interpreter. [R. 33].

shoots down through her back to her legs, and that she gets cramps in her legs that makes standing difficult. [R. 36, 37]. She explained that she gets headaches, becomes dizzy, and doesn't feel like doing anything but stay in her room. [R. 38].

According to Plaintiff, she sees one doctor on a regular basis. [R. 39]. Plaintiff testified that she takes medication on a regular basis. *Id.* However, Plaintiff stated that the medication only makes her drowsy and depressed. *Id.* According to Plaintiff, she was also receiving shots but they did not help alleviate the pain. [R. 40]. Plaintiff testified that she is not undergoing any physical therapy and does not use a cane or other assisted device. [R. 41]. However, Plaintiff stated that she wears a brace for her back and wrist, which does help with the pain. *Id.*

Plaintiff testified that she received unemployment benefits between 2012 and June of 2013. [R. 40]. She clarified that she filled out applications but was never called, even though she would be unable to work if a job was offered to her. [R. 41].

Plaintiff then testified as to her medical problems. [R. 42]. She stated that she feels pain that travels from her neck, into her shoulders, down her back, legs, and to her feet. *Id.* Plaintiff explained that when the pain is intense, the pain will go down both legs. *Id.* She stated that she experiences this pain daily, but some days are more intense than others. *Id.* Plaintiff estimates that she experiences a pain scale of 10/10 about four days a week. [R. 43]. Plaintiff testified that she does not know what makes the pain worse but makes tea and uses heating remedies to help relieve the pain. *Id.*

According to Plaintiff, she is limited to about 15 to 20 minutes of sitting and about 10 to 15 minutes of standing. [R. 43-44]. Plaintiff testified that she can probably lift a gallon of milk, but does not remember the last time she tried to do that. [R. 44]. Plaintiff stated she

does not cook, do dishes, vacuum, take out the trash, or mop the floor. [R. 44-45]. She stated that her husband pays the bills, and her daughter cleans and does the laundry. [R. 45].

Plaintiff testified that she is unable to sit for six hours out of an eight-hour day because she gets headaches and her head begins to feel "very heavy." *Id.* She stated that she experiences strong headaches at least four times a week, and the pain shoots down from her head to her back and into her feet. [R. 47]. To relieve the headaches, Plaintiff testified that she takes her medication and sits in her room, not wanting to talk to anybody. *Id.*

Next, Denise Wadell, a vocational expert, testified. [R. 48]. She classified Plaintiff's past work as a daycare worker as semiskilled with an SVP level of 4 in the light exertional work category, and Plaintiff's past work as a fruit packer as unskilled with an SVP level of 2 in the medium exertional category. [R. 49]. The ALJ posed the vocational expert a hypothetical in which an individual could work at the light exertional level and the individual could occasionally stoop, crawl, climb ladders, ropes, or scaffolds, should avoid concentrated exposure to vibrations, unprotected heights and dangerous machinery, and was limited to occasional overhead reaching with the right upper extremity, and would need to understand and communicate using simple English. *Id.* Given those facts, the expert found that the individual could not perform past relevant work as performed. *Id.* However, the expert stated that the individual could perform other jobs at the light exertional level, such as a folding machine operator, a small parts assembler, and a production worker. [R. 50]. Next, the ALJ posed a hypothetical in which an individual could do everything listed in the first hypothetical, except that the exertional level would be sedentary rather than light. *Id.* The expert stated that the individual would not be able to do any of the past work identified, but would be able to do other jobs at the sedentary exertional level, such as production checker, wire wrapper, and optical lens

4

inserter. *Id.* Finally, the ALJ posed a hypothetical in which an individual could do everything listed in the first hypothetical, except that the individual could not work for eight hours a day, five days a week due to combination of impairments. *Id.* The expert stated that the individual could not perform any work. [R. 51].

## B. Medical Record Evidence

In reaching his decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized chronologically below.

Plaintiff was admitted by C-collar and backboard to the Lakeside Medical Center Emergency Room after a motor vehicle accident on March 14, 2012, and complained of having a severe headache, neck pain, and lower back pain. [R. 262]. EMS reports the accident was "minor" and there was no reported head injury. *Id.* However, Plaintiff claimed her symptoms were "aching," severe, and a 10/10 pain scale at the time of her admittance. *Id.* Physical examination showed no significant traumatic injuries or tenderness and a full range of motion in all joints. [R. 263]. Plaintiff was examined again an hour later and reported feeling better. [R. 264]. CT scan showed the brain to be within normal limits when compared to Plaintiff's pre-accident CT scan. [R. 266]. Examination of the lumbar spine showed well-maintained vertebral body heights and intervertebral disc spaces, with no fracture and minimal degenerative changes. [R. 267]. Hypertrophic changes were reported at the uncovertebral joints at C6 and C7 of the cervical spine. [R. 268]. Plaintiff was discharged an hour later with acute traumatic cervical strain, acute traumatic lumbar sprain, and acute cephalgia. *Id.* Plaintiff was prescribed 10mg Flexeril for muscle pain and spasm, 50mg Ultram for pain, and advised to take ibuprofen if the pain persisted. [R. 265].

On March 20, 2012, Plaintiff sought chiropractic consultation from American Med-Care

Center for her alleged back pain from the accident. [R. 308-10]. Plaintiff reported experiencing the following symptoms: headache, neck pain, sleeping problems, back pain, nervousness, tension, chest pain, dizziness, her head seemed heavy, she had pins and needles in her arms and legs, pain in her arms and legs, numbness in her toes, cold hands and feet, fatigue, lights bothering her eyes, buzzing in her ears, fainting, and cold sweats. [R. 310]. She reported that she had not worked since the accident. *Id.* On her first visit, Dr. Reimer wrote a note suggesting Plaintiff not work until March 31, 2012 due to her injuries. [R. 320]. Plaintiff continued to receive similar notes by Dr. Reimer suggesting she not work due to her injuries. [R. 325-27]. The final recorded note was written on May 2, 2012, suggesting that Plaintiff not work for two weeks. [R. 324]. Between March 21, 2012 and August 29, 2012, Plaintiff attended approximately forty physical therapy sessions at American Med Care. [R. 356-425].

On April 2, 2012, Dr. Doben from American Med Care performed an initial evaluation of Plaintiff's injuries. [R. 348-51]. Plaintiff reported her pain levels as follows: neck pain, 10/10; back pain, 8/10; and mid-back pain 7/10. [R. 348]. Plaintiff also complained of having neck pain radiating to both shoulders, and mid- and low-back pain, with intermittent numbness in right and upper and lower extremities. *Id.* On this visit, Plaintiff reported that she was unemployed and that Plaintiff "is able to perform activities of daily living." [R. 349]. Discomfort was recorded in Plaintiff's neck at C: 2-7 and her right and left paracervical region with right and left paracervical muscle spasm. [R. 350]. Discomfort was also recorded at L: 1-5-1, and her right and left paralumbar region with right and left paralumbar muscle spasm. *Id.* Finally, pain was recorded on the thoracic spine over T4-7, and her right and left paraspinal muscles with paraspinal muscle spasm. *Id.* Her heel and toe walking and gait patterns were normal. [R. 351]. Dr. Doben's diagnostic impression was cervical and lumbar sprain-strain

and radiculitis and thoracic sprain-strain. *Id.* Plaintiff was prescribed 50mg Ultram during this visit. *Id.*

Between April 30, 2012 and May 29, 2012, Plaintiff received follow-up exams by Dr. Doben at American Med Care. [R. 339-47]. During each visit, Plaintiff reported some relief with therapy, no new symptoms, and normal sensory and motor skills. *Id.* During a neurological examination performed on April 30, 2012, Plaintiff's heel and toe walking and gait patterns were reported to be normal and her grip intact. [R. 346]. Dr. Doben performed nerve block injections to right C4-5 and C5-6 during this visit. *Id.* Plaintiff reported improvement in her pain relief from the cervical injections she received on April 30, 2012 during her follow-up visit on May 14, 2012. [R. 342]. During this visit, nerve block injections were performed on Plaintiff to her right C3-4 and right C4-5. [R. 343]. On her final follow-up visit on May 29, 2012, Plaintiff reported the injections she received on May 14, 2012 gave partial relief, and she received another set of injections to her right C4-5 and C5-6. [R. 339-40].

Dr. Reimer performed a final evaluation of Plaintiff's injuries on June 5, 2012. [R. 311]. Dr. Reimer reported treating Plaintiff with conservative care, including electrical muscle stimulation, trigger point therapy, spinal mobilization and deep tissue massage. *Id.* However, Plaintiff continued to complain of headache, neck pain, low- and mid-back pain, bilateral shoulder, right arm pain, and bilateral leg pain. *Id.* Dr. Reimer reported that Plaintiff had "reached maximum medical improvement in relation to the therapy administered by [his] office." *Id.*

An MRI of the cervical spine and lumbar spine were performed on June 20, 2012. *Id.* The cervical spine MRI revealed broad based bulging annulus at C3-4 with compression on the thecal sac, 2mm focal right disc herniation at C4-5 with compression on the thecal sac and 2mm

broad based disc herniation at C5-6 with compression on the thecal sac. *Id.* The lumbar spine MRI showed bulging annulus at L4-5 with compression on the thecal sac. *Id.*

In his final report, Dr. Reimer determined from his assessment that Plaintiff sustained injuries as a result of the accident, and that Plaintiff's condition was in a chronic state, and that the chance of formed adhesions was high. *Id.* Further, he opined that, due to longevity of her symptoms, Plaintiff's injuries had "created consequential permanent partial impairment with permanent and significant loss of function especially in the cervical and lumbar spine and associated nerve roots." [R. 311-12]. Dr. Reimer concluded that Plaintiff suffered from a 12% Whole Person Impairment. [R. 313].

Plaintiff filed her initial claim for disability on May 24, 2012, alleging spinal injury, right arm injury, and neck injury as her inability to work. [R. 190-196]. Dr. Krishnamurthy assessed Plaintiff on July 5, 2012 for the Disability Determination. [R. 70-76]. Based on the medical evidence of record, Dr. Krishnamurthy found Plaintiff's Medically Determinable Impairment (MDI) to be diagnosed as DDD (Disorder of Back-Discogenic and Degenerative) at the severe level. [R. 72]. Next, Dr. Krishnamurthy performed a Residual Functional Capacity (RFC) assessment. *Id.* Dr. Krishnamurthy rated Plaintiff's exertional limitations to occasional lifting and/or carrying of 20 pounds; frequent lifting and/or carrying to 10 pounds; and standing, walking, and sitting were limited to about 6 hours in an 8-hour work day. [R. 73]. Plaintiff's postural limitations were limited to occasional climbing ladders, ropes, or scaffolds; occasional stooping, and crouching. *Id.* Finally, Plaintiff's environmental limitations were to avoid concentrated exposure of vibration and hazards, such as machinery and heights. [R. 74]. Dr. Krishnamurthy noted that the symptoms are "partially credible," and that x-rays showed minimal degenerative changes in Plaintiff's spine. *Id.* Dr. Krishnamurthy concluded from Plaintiff's

RFC that she is capable of work at the light exertional level and cited three occupations in which there are a significant number of jobs that exist in the national economy: table worker, election clerk, and addresser. [R. 75]. Based on these documented findings, Plaintiff was determined to be "Not Disabled" on July 9, 2012. [R. 75-76].

On July 19, 2012, x-rays of the Plaintiff's cervical spine and right shoulder were performed by Dr. Kirchner from Independent Imaging. [R. 306-07]. Radiology reports of the cervical spine showed mild straightening of the normal lordotic curvature. [R. 306]. Disc spaces were reported to be well-maintained and no acute fracture or subluxation was seen. *Id.* Mild degenerative changes were reported in the right shoulder joint, but no acute fracture or dislocation was seen. [R. 307]. An MRI of Plaintiff's shoulder was performed again on July 25, 2012 by Dr. Robbins. [R. 333-34]. No tearing or fracture was found during this exam. *Id.* Plaintiff also received epidural steroid injections from Dr. Padula at Interventional Pain Management, LLC for her continued pain on July 28, 2012 and August 2, 2012. [R. 330-32].

Plaintiff filed a Disability Report Appeal on September 19, 2012. [R. 197-202]. On or about September 19, 2012, M. Guzman conducted a face-to-face interview with Plaintiff to complete her Request for Reconsideration Disability Report. [R. 61-63]. In his observations during the interview, M. Guzman reported that he observed no signs of physical difficulty in Plaintiff's sitting, standing, walking, or talking. [R. 62]. However, he noted that Plaintiff seemed "very depressed," was crying, and stated that she could not take care of her husband or household, and couldn't carry her grandchildren due to being in "constant pain." *Id.* Plaintiff alleged in her Request for Reconsideration that, since approximately September 19, 2012, the pain was more intense and that MRIs showed hernias in her neck. [R. 78-79]. Plaintiff reported that since about September 18, 2012, "I can [sic] function like I used to. I cant [sic]

stand for too long or sit or lay. I cant [sic] do house work or any other activities like I use to. My right arm I can [sic] use, it is always in pain." [R. 79].

On October 4, 2012, Plaintiff was contacted by telephone by Carla Boidi from the Miami Disability Determination office to discuss her alleged worsened condition. [R. 203]. Plaintiff reported to Ms. Boidi that the pain in her shoulder is more intense, that she has pain in her right arm "almost constantly, however, she can bathe and dressed independently." *Id.* Plaintiff claimed that the pain in her right arm prevents her from cooking and doing her Activities of Daily Living (ADL), but that her medication seems to work and that she is "very compliant with her meds." *Id.* Ms. Boidi also reported that Plaintiff described feeling depressed due to her physical problem and her inability to cook "makes her feel sad." *Id.* Plaintiff reported that she had never taken any psychiatric medication, had never seen a psychiatrist, and had never been hospitalized for any mental condition. *Id.* Ms. Boidi concluded that no further mental development was needed because Plaintiff claimed that her depression is secondary to her physical condition and restriction on her ADL. *Id.*

Dr. Patty, the medical consultant from the Disability Determination Service, assessed Plaintiff's disability claim at the reconsideration level on October 5, 2012 for her allegedly worsened pain in her right arm, limitations in her ADL, and depression. [R. 78-86]. An MRI of Plaintiff's right shoulder and C-spine were submitted into the medical evidence of record and used in Dr. Patty's assessment. *Id.* Dr. Patty determined that Plaintiff's Medically Determined Impairment was DDD (Disorders of Back-Discogenic and Degenerative) at the severe level, and that this could reasonably be expected to produce Plaintiff's pain and alleged limiting effects. [R. 81].

Dr. Patty next conducted a Residual Functional Capacity assessment. [R. 78-86]. For

exertional limitations, Dr. Patty limited Plaintiff to occasional lifting or carrying of 20 pounds; frequent lifting or carrying of 10 pounds; and sitting, standing, and walking for about 6 hours in an 8-hour workday. [R. 82]. In support of this limitation, Dr. Patty noted that the most recent notes made by a treating physician were on April 30, 2012, and that Plaintiff had some relief with her neck and low back pain with therapy and radiation. *Id.* Plaintiff's most recent physical therapy was on May 16, 2012, which noted PVSM spasm in her right and left hip, and right shoulder swelling of C spine, LS spine and T spine noted tenderness. *Id.* Due to Plaintiff's alleged pain, Dr. Patty rated her postural limitations to occasionally climbing ladders, ropes, and scaffolds; occasionally stooping, such as bending at the waist; and occasionally crouching, such as bending at the knees. [R. 82-83]. As for environmental limitations, Plaintiff was to avoid concentrated exposure to vibrations and hazards, such as machinery and heights. [R. 83]. Dr. Patty noted that Plaintiff's right shoulder MRI showed "minimal supraspinatus tendonosis [sic], no rotator cuff gap or tendon tear; [and] no internal derangement [sic][,]" and that C-spine MRI showed straightening of lordotic curve. [R. 84]. Finally, Dr. Patty noted minimal degenerative changes in spinal x-rays. *Id.*

Dr. Patty next assessed Plaintiff's ability to perform Past Relevant Work (PRW) as a teacher. *Id.* Dr. Patty determined that Plaintiff was not able to perform PRW because it required frequent stooping, while Plaintiff's current RFC assessment reduces her to only occasional stooping. *Id.* However, Dr. Patty noted that Plaintiff was still capable of work at the light exertional level and was not limited to unskilled work because of her impairment. [R. 85]. Based on these findings, Dr. Patty determined that Plaintiff was not disabled. [R. 85-86].

Plaintiff received follow-up physical examinations and medication refills from American Care between October 23, 2012 and December 3, 2013. [R. 436-62]. Notes from each of

those visits indicate that Plaintiff is employed at a daycare and that she exercises regularly by running with children. *Id.* Her visit on October 23, 2012 reported that Plaintiff felt depressed due to life changes and "chronic pain" stemming from her accident. [R. 460-61]. She also reported feeling fatigued "all the time." [R. 460]. On November 26, 2012, Plaintiff reported right shoulder pain, which was alleviated with pain medication, and neck pain. [R. 457]. She also reported muscle tenderness and decreased range of motion in her right shoulder. [R. 458]. Finally, Plaintiff reported that her depression was improved with medication. [R. 457]. Plaintiff was directed to limit her lifting to no more than twenty pounds. [R. 458].

Plaintiff filed another Disability Report – Appeal on December 26, 2012. [R. 205-11]. Plaintiff alleged "worse pain in [her] injuries" beginning around August, 19, 2012. [R. 205]. She also reported feeling depressed since around March 20, 2012. *Id.* Plaintiff reported her last visit with Dr. Reima for chiropractic care was on October 5, 2012. [R. 206]. She also reported her last visit with Dr. Padula for pain injections was on August 16, 2012. [R. 207]. Plaintiff also reported her first visit with Dr. Palacio was on April 18, 2012, and claimed that her next appointment would be on December 26, 2012. [R. 208]. Plaintiff reported taking meloxicam and tramadol for pain; citalopram as an antidepressant; cyclobenzaprine hydrochloride for muscle pain; and lisinopril for blood pressure—all prescribed by Dr. Palacio. *Id.* Plaintiff claimed that she is unable to complete her everyday activities, and that "[e]veryday [her] arm is getting less useful." [R. 209-10].

On January 3, 2013, Plaintiff visited American Care for a routine follow-up. [R. 454-56]. A functional status assessment was performed, and Plaintiff reported that she was able to bathe and dress herself; prepare meals and do housework; and walk independently without assistance. [R. 454]. On February 4, 2013, Plaintiff reported her neck and right shoulder pain

was improved with medication and Voltaren gel. [R. 452].

Another Disability Report—Appeal was submitted on February 14, 2013. [R. 212-16]. Plaintiff claimed that since around October 1, 2012, her health had gotten worse. [R. 212]. Plaintiff reported her first visit with Dr. Palacio was around March of 2012, and her last visit was around October of 2012 for medication to treat her health conditions. [R. 213]. Plaintiff reported taking ibuprofen and loratadine, an antihistamine, for her pain. [R. 214]. Plaintiff alleged that she is unable to care for herself and that someone needs to assist her at all times. *Id.* She reports that her life is not the same because of her condition and that she is unable to socialize. *Id.*

Plaintiff's follow up visit with American Care on March 14, 2013 indicated that her neck and right shoulder pain were controlled with Tramadol and Voltaren gel, but were still present. [R. 450]. She also reported a decreased range of motion due to her injuries. [R. 451].

On April 23, 2013, Dr. Palacio completed an RFC Questionnaire. [R. 270-72]. He diagnosed Plaintiff with right cervical disc herniation and depressive disorder, and indicated that he prescribed Plaintiff with Tramadol, Citalopram, and Lisinopril. [R. 270]. When asked what symptoms for these conditions or medications could reasonably be expected to produce in Plaintiff, Dr. Palacio marked the following: radiating pain, arm and neck pain, depression, headaches, mood disturbance, anxiety, and fatigue/weakness. [R. 271]. Dr. Palacio reported that Plaintiff's condition would require her to be absent from work more than four times per month. *Id.* However, when asked whether Plaintiff would be required to take unscheduled breaks, Dr. Palacio answered "[n]o." [R. 272]. He also reported that Plaintiff's deficiencies in concentration, persistence, or pace would "frequently" result in a failure to complete tasks in a timely manner. [R. 271]. Dr. Palacio opined that Plaintiff's condition lasted, or is expected to

last, at least twelve months. *Id.* Dr. Palacio's support for this opinion came from a cervical MRI and C4 and C5 slipped discs. *Id.* Finally, Dr. Palacio limited Plaintiff to "never" pulling, pushing, or overhead lifting; "frequently" bending, climbing, grasping, kneeling, squatting, overhead reaching, floor-to-waist lifting, and standing; and "constantly" sitting and walking. *Id.*

On May 8, 2013, Plaintiff had a follow up visit at American Care. [R. 446-47]. She had no reported complaints and no reported pain in her joints or muscles, but did note that she had right shoulder pain present. [R. 446]. On July 25, 2013, Plaintiff reported having low back and neck pain with no other reported complaints. [R. 442-43]. Her visit on November 8, 2013 indicates that Plaintiff reported sharp low back pain for the past year that had worsened in the two weeks prior. [R. 439]. Plaintiff also reported no depression on this visit. [R. 439-40]. Her last recorded visit with American Care was on December 3, 2013. [R. 436-38]. During this visit, there was no reported pain or complaints of any symptoms stemming from her accident. *Id.*

On February 21, 2014, Plaintiff reported to the Social Security Administration that she had been seeing Dr. Palacio since her last Disability Report was submitted in February of 2013. [R. 239]. She reported that the doctor told her that she would be unable to work again due to her condition and that she could not carry anything heavy. *Id.* Plaintiff also reported that her current medication was 50mg Tramadol, 7.5mg Meloxicam, Advil, and Tylenol for pain, 10mg Cyclobenzaprine for muscle pain, and Chalopram for depression. [R. 240].

### C. ALJ Decision

The ALJ issued his decision on Plaintiff's claim for benefits on June 17, 2014. [R. 12-28]. The ALJ explained the five-step sequential evaluation process for determining whether

an individual is disabled. [R. 15-17]. He found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016, and had not engaged in substantial gainful activity since March 14, 2012, the alleged on-set date. [R. 17]. The ALJ then found that Plaintiff suffers from the following severe impairments: degenerative disc disease and degenerative joint disease of the shoulder. *Id.*

The ALJ next found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* The ALJ noted that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment of the Listing of Impairments." [R. 18].

The ALJ then completed a residual functional capacity ("RFC") assessment and found that Plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except that Plaintiff is capable of only occasional stooping, crouching, and climbing of ladders, ropes, or scaffolds. *Id.* The ALJ noted that Plaintiff should avoid concentrated exposure to vibration and hazards including unprotected heights and dangerous machinery, and is limited to occasional overhead reaching with the right upper extremity. *Id.* Further, the ALJ stated that Plaintiff is able to understand and can communicate using simple English. *Id.* The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. *Id.*

The ALJ then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to

produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit her functions. *Id.* The ALJ went through the various medical records in extensive detail. [R. 18-21]. The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." [R. 19].

The ALJ further found that Plaintiff's diagnostic testing results fail to support Plaintiff's assertion that her conditions are disabling. *Id.* Specifically, he determined that Plaintiff did not receive "the type of medical treatment one would expect for a totally disabled individual." [R. 20]. The ALJ cited nurse practitioner records that denote significant pain relief with medication and injections, and noted that Plaintiff did not require emergent care for intractable pain or seek neurological or surgical consultation despite allegations of severe pain and headaches. *Id.* The ALJ supported his conclusion by noting "significant treatment gaps" between December 2013 and the date of hearing in April of 2014. *Id.* The ALJ concluded that Plaintiff's "conservative treatment indicates her symptoms are not as disabling as purported." *Id.*

The ALJ next asserted that Plaintiff's testimony was "generally not forthcoming" at the hearing. *Id.* His reasoning was that Plaintiff "did not provide convincing details regarding factors which precipitate her allegedly disabling symptoms, claiming instead that the symptoms are present 'constantly.'" *Id.* Further, the ALJ noted that Plaintiff's "self-described pain, severe medication side effects, and inability to remain seated for more than fifteen minutes are inconsistent with the claimant's ability to remain seated comfortably for the duration of the

hour-long hearing and her observed attentiveness." *Id.* He explained that Plaintiff's ability to "participate fully and closely, without any signs of either distraction or overt pain behavior" is "one of only many factors relied upon" in reaching his conclusion in disregarding Plaintiff's credibility and assessing her residual functional capacity. [R. 20-21].

The ALJ also looked to Plaintiff's work history and found that it failed to support her allegations of disabling conditions. [R. 21]. He explained that Plaintiff testified at the hearing that she had not been employed since March of 2012, but treatment records indicated that she described running with children at daycare in May 2013 and employment in daycare as early as December 2013. *Id.* Additionally, the ALJ noted that Plaintiff was receiving unemployment compensation benefits between 2012 and the third quarter of 2013, "receipt of which is conditioned upon continual certification of both willingness and physical ability to work." *Id.* Finally, the ALJ discredited Plaintiff's allegations of limited daily activities for two reasons:

> First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision.

*Id.*

In terms of the opinion evidence, the ALJ assigned "little weight" to Plaintiff's treating physician, Dr. Palacio. *Id.* The ALJ explained that "treatment records contemporaneous with [Dr. Palacio's] opinion describe unremarkable physical findings, as well as an absence of mental health complaints and increased activity with treatment." *Id.* The ALJ further noted that,

> [t]he possibility exists that a doctor may express an opinion in an effort to assist a patient with whom he sympathizes for various reasons. Notably, it is also possible that a doctor may provide supportive notes or reports in order to satisfy patient requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm such situations when the [sic] occur, they appear to be more likely when the physician opinion in question

departs substantially from the remainder of the medical record, as is seen in the present case.

*Id.* The ALJ gave Dr. Palacio's opinion little weight. *Id.* Rather, the ALJ stated that he based his RFC assessment "in large part on the opinion of Dr. Patty, the medical consultant from the Disability Determination Service" because it was "generally consistent with the evidence available in the case." *Id.*

The ALJ acknowledged that while Plaintiff's impairments are severe, "the evidence does not support the assertion that they preclude her from completing basic work related activities" within the RFC. [R. 22]. He then limited Plaintiff to "light exertional level work, with additional postural limitations and right sided reaching limitations in deference to her spinal and right shoulder conditions, minimally documented by abnormal clinical and diagnostic findings," however, he did not accommodate Plaintiff's alleged mental impairments, finding no evidence that they limited her ability to work. *Id.* The ALJ then concluded that his RFC assessment was supported by objective findings, medical opinions, and other factors previously discussed. *Id.*

The ALJ next concluded that, considering the Plaintiff's RFC, Plaintiff was unable to perform her past relevant work because it exceeds the RFC. *Id.* The ALJ noted that this conclusion was supported by the hearing testimony of the vocational expert. *Id.* However, after considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform, including folding machine operator, small parts assembler, and production worker. [R. 23].

Finally, the ALJ found that Plaintiff "has not been under a disability, as defined in the

Social Security Act, from March 14, 2012, through the date of this decision."  *Id.*

## II.  MOTIONS FOR SUMMARY JUDGMENT

In her Motion for Summary Judgment with Supporting Memorandum of Law, Plaintiff makes two main arguments.  [DE 26].  First, she argues that the ALJ's unfavorable credibility finding is unsupported by substantial evidence and based on a flawed rationale.  [DE 26, p. 9-13].  Next, Plaintiff asserts that the ALJ erred in rejecting the opinion of Dr. Palacio and in issuing an RFC finding unsupported by substantial evidence.  [DE 26, p. 14-16].  Therefore, Plaintiff asks that this Court reverse the denial of Plaintiff's application for disability benefits and remand this matter for further administrative proceedings.  [DE 26, p. 16].

In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgement, Defendant argues that substantial evidence supports the ALJ's finding that Plaintiff's allegations of disabling limitations were not credible.  [DE 29, pp. 5-15].  Defendant next claims that substantial evidence supports the ALJ's weight given to Dr. Palacio's opinion.  [DE 29, p. 15-19].

Plaintiff filed a Reply [DE 31] to Defendant's Motion for Summary Judgment maintaining all of her arguments.  Plaintiff claims that the ALJ's negative credibility finding of Plaintiff was "contrary to the evidence of record and law prohibiting 'sit and squirm' determinations." [DE 31, p. 1].  Plaintiff also asserts that the ALJ's rationale for according Dr. Palacio's opinion "little weight" was unsupported by the evidence of record.  [DE 31, p. 4].

## III.  LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards.  Substantial evidence is more than a scintilla and is such relevant evidence as a

reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F. 3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F. 3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F. 2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F. 2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F. 2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F. 3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f). The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain

impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work.   *See Gibson v. Heckler*, 762 F. 2d 1516, 1518, n. 1 (11th Cir. 1985).   If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded.   20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work.   If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established.   20 C.F.R. § 404.1520(e).   The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience.   20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239.   In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert.   *See Phillips*, 357 F. 3d at 1239-40.

The Eleventh Circuit has established a three part "pain standard" to be utilized by the ALJ when a claimant tries to "establish disability through his or her own testimony of pain or other subjective symptoms."   *Holt v. Sullivan*, 921 F. 2d 1221, 1223 (11th Cir. 1991).   The standard requires "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain."   *Id.*   Moreover, "[t]he claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support

a finding of disability." *Id.* The ALJ must specifically explain why he or she is deciding to discredit such testimony, and "[f]ailure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true." *Id.*

### A. Whether the ALJ improperly discredited Plaintiff's testimony regarding her subjective complaints

Plaintiff asserts that the ALJ's credibility determination failed to comply with the requirements of SSR 96-7p and the *Holt* pain standard, and was not supported by substantial evidence. [DE 26, p. 9-10]. Plaintiff notes that the ALJ relied on medical records that document Plaintiff running with children, but emphasizes the probability that this was an inaccurate update of Plaintiff's electronic record from prior visits at the clinic. [DE 26, p. 10]. Plaintiff also notes that her receipt of unemployment compensation was minimal, and that "[t]here is no prohibition against an individual looking for work, even though they suspect they could not perform such work even if given the opportunity." [DE 26, p. 10-11]. Plaintiff contends that the ALJ also improperly utilized "sit and squirm jurisprudence" in his evaluation of Plaintiff's testimony over a video monitor during the hearing, and that his finding is not supported by substantial evidence. [DE 26, p. 11-12]. Specifically, Plaintiff contends that the ALJ used "problematic rationale" in finding Plaintiff's testimony at the hearing to be "generally not forthcoming" because he did not explain his reasons for discrediting Plaintiff's testimony, who was assisted by a Spanish-language interpreter. [DE 26, p. 11]. Plaintiff also alleges that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." [DE 26, p. 12]. Finally, Plaintiff asserts that the ALJ relied on impermissible factors, such as requiring objective verification, in discrediting Plaintiff's testimony on her alleged limitations in her daily living activities. [DE 26, p. 12-13].

Defendant contends that substantial evidence supports the ALJ's finding that Plaintiff's allegations of disabling limitations were not credible. [DE 29, p. 5]. Defendant argues that the ALJ appropriately weighed all available evidence in making his credibility determination, including inconsistencies in the medical record and Plaintiff's testimony. [DE 29, pp. 8-9]. Defendant also notes that substantial evidence supports the ALJ's conclusion that Plaintiff's treatment was conservative, thus undermining Plaintiff's subjective complaints of disabling conditions. [DE 29, p. 11]. Further, Defendant contends that Plaintiff's receipt of unemployment benefits provided the ALJ additional evidence that the Plaintiff's conditions were not disabling, because unemployment benefits are conditioned upon the beneficiary's physical ability and willingness to work. [DE 29, p. 12]. Finally, Defendant asserts that the ALJ did not engage in "sit and squirm jurisprudence" because the ALJ emphasized that his observations at the hearing were one of many factors in coming to his conclusion. [DE 29, p. 14-15].

The three-part pain standard for evaluating a claimant's subjective complaints of pain and disabling conditions requires: "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt*, 921 F.2d at 1223. The ALJ attested that he had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all opinion evidence. [R. 18]. He then followed the two-step process of first, determining whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's

symptoms to determine the extent to which they limit her functions. *Id.* After reviewing the evidence, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [Plaintiff]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." [R. 19].

The ALJ went through the various medical records in detail. [R. 19-22]. The ALJ found that, while diagnostic testing results "affirm [Plaintiff]'s alleged spine and joint disorders, they fail to support [her] assertion that these conditions are disabling." [R. 19]. The ALJ reviewed the cervical x-rays from the date of Plaintiff's accident, which note "only minimal degenerative changes without evidence of fracture." *Id.* After reviewing the lumbar and cervical spine MRI results from June of 2012, as well as the right shoulder MRI from July 25, 2012, the ALJ concluded that these imaging studies failed to show "significant abnormalities, instead identifying only moderate degenerative spinal changes without evidence of frank cord compromise, and chronic shoulder tendinosis without tear or derangement." *Id.* The ALJ further noted that triage reports from the date of the accident indicate that the motor vehicle accident was "minor," and that physical examination demonstrated that Plaintiff had shown full range of motion and no "tenderness to palpation of the spine." *Id.*

Next, the ALJ discussed the conservative treatment and pain relief Plaintiff experienced from her use of medication and other treatments. [R. 19-20]. Plaintiff participated in chiropractic adjustments performed by Dr. Reimer between March 21, 2012 and August 29, 2012, totaling approximately forty sessions. [R. 356-425]. On June 5, 2012, Dr. Reimer noted in his final evaluation that Plaintiff "had reached maximum medical improvement" in regards to therapy, and that her permanent disability rating was 12%. [R. 311, 313]. The ALJ noted that,

despite this disability rating, Dr. Reimer did not identify Plaintiff's physical limitations.  [R. 19].  The ALJ also noted that Plaintiff reported improved symptoms from injection therapy during a follow-up visit on May 29, 2012, and physical examinations showed "normal gait patterns, neurological function, and intact grip strength."  [R. 20].  Plaintiff was limited to lifting twenty pounds during a visit at American Care on November 26, 2012, and she denied depression during her final visit on November 8, 2013.  [R. 457, 439-40].  The ALJ cited nurse practitioner reports during her last visit on December 3, 2013, which indicated no reported complaints other than a urinary tract infection.  [R. 20, 436-38].  Plaintiff's final epidural steroid injection of the cervical spine was on July 28, 2012, and the record indicates no further treatment, physical therapy, or consultations were sought for her symptoms.  [R. 20].  As the ALJ concluded, "[Plaintiff]'s history of largely conservative treatment does not support allegations of disabling conditions."  *Id.*

In finding that "[Plaintiff]'s treatment record does not lend support to assertions of disabling conditions" under the factors enumerated in SSR 96-7p, the ALJ explained that Plaintiff had not "received the type of medical treatment one would expect from a totally disabled individual."  *Id.*  The ALJ cited nurse practitioner records that "consistently denote significant pain relief with medication and injections between May of 2012 and December of 2013."  *Id.*  Further, the ALJ noted that no neurological or surgical consultation was sought despite Plaintiff's complaints of severe pain and headaches.  *Id.*  Finally, the ALJ explained that Plaintiff's record revealed "significant treatment gap, during which [she] received no medical care, specifically between December of 2013 and the date of hearing in April of 2014."  *Id.*  The ALJ concluded that Plaintiff's "successful conservative treatment" indicated that her symptoms were "not as disabling as purported."  *Id.*

The ALJ noted that "[a]nother factor influencing the outcome reached in this decision" was his observation that Plaintiff's testimony at the hearing was "generally not forthcoming." *Id.* The ALJ explained that Plaintiff "did not provide convincing details regarding factors which precipitate her allegedly disabling symptoms, claiming instead that the symptoms are present 'constantly.'" *Id.* The ALJ noted that his observation of Plaintiff's attentiveness, participation, and her "ability to remain seated comfortably for the duration of the hour-long hearing" was inconsistent with her "self-described pain, severe medication side effects, and inability to remain seated for more than fifteen minutes." *Id.* The ALJ explained that this was "only one of many factors relied upon" in determining Plaintiff's credibility regarding her allegations and in assessing her residual functional capacity. [R. 20-21].

Finally, the ALJ found that "[Plaintiff]'s work history [failed] to support her allegations of disabling conditions." [R. 21]. The ALJ cited treatment records that indicate Plaintiff reported running with children at daycare between May of 2013 and December of 2013, despite her testimony that she had not been employed since March of 2012. *Id.* Further, Plaintiff received unemployment compensation benefits between 2012 and the third quarter of 2013, "receipt of which is conditioned upon continual certification of both willingness and physical ability to work." *Id.* The ALJ explained that two factors weighed against finding Plaintiff's limitations as far as her daily activities to be credible:

> First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if [Plaintiff]'s daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision.

*Id.* The ALJ concluded that Plaintiff's reported limitations on daily activities were "outweighed by the other factors discussed in this decision." *Id.*

The Court finds that the ALJ followed the pain standard discussed in *Holt*. As stated in *Holt*: "If the ALJ decides not to credit such testimony, he [or she] must articulate explicit and adequate reasons for doing so." 921 F. 2d at 1223. After a careful review of the record, the Court finds that the ALJ did articulate explicit and adequate reasons for discrediting Plaintiff's testimony. The ALJ cited multiple reasons for his credibility determination, including the medical evidence, Plaintiff's actual allegations of pain at the hearing, and Plaintiff's work history. *See* 20 C.F.R. § 404.1529. This Court cannot reweigh the evidence.

With regard to Plaintiff's work history, the ALJ did not err in considering the record evidence that indicates Plaintiff was running with children between October 23, 2012 and December 3, 2013. Plaintiff argues that the ALJ failed to consider the possibility that these records were perhaps automatically carried over from previous visits to this clinic. [DE 31, p. 2]. While this may be so, the record fails to show any such visits to American Care prior to October 23, 2012. [R. 436-62]. Therefore, even if Plaintiff first reported working in a daycare and running with children in October of 2012, that date was still subsequent to her alleged onset date of March 14, 2012 when she allegedly stopped working.

Further, the medical record evidence indicates that Plaintiff received notes from Dr. Reimer indicating that Plaintiff needed a temporary leave from work between March 20, 2012 and May 2, 2012. [R. 319-27]. The final note, received on May 2, 2012, suggests Plaintiff not work for only two weeks. [R. 324]. These short-term leave notes, without more, fail to demonstrate contrary evidence that Plaintiff was employed at the time of her visits at American Care. Thus, the ALJ did not err in considering this a factor, among others, to determine Plaintiff's allegations were not credible.

As to the ALJ's consideration of Plaintiff's receipt of unemployment benefits, while the

receipt of unemployment benefits alone is an insufficient reason to deny disability benefits, the ALJ may consider the application for and receipt of unemployment benefits to be a factor in undermining a Plaintiff's credibility. *Roberts v. Colvin*, No. 15-CV-80266, 2016 WL 5001223, (S.D. Fla. Mar. 29, 2016) ("Applying for unemployment compensation benefits undermines a claimant's allegation of a credible disabling impairment, because 'a claimant who applies for unemployment compensation benefits holds [him]self out as available, willing, and able to work.'" (quoting *Morrison v. Astrue*, No. 08-CV-80886, 2009 WL 3295113, *6 (S.D. Fla. Oct. 13, 2009))). Plaintiff did indeed receive unemployment compensation benefits between 2012 and the third quarter of 2013. Because Plaintiff's receipt of unemployment benefits was not a sole factor in the ALJ finding Plaintiff's allegations of disabling conditions to be not credible, the ALJ did not commit an error in considering Plaintiff's receipt of unemployment benefits, let alone a reversible error.

As to Plaintiff's "sit and squirm" argument, Plaintiff is correct that an ALJ is not permitted to utilize "sit and squirm" jurisprudence. *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982). The Eleventh Circuit in *Freeman* defined "sit and squirm jurisprudence" as follows: "In this approach, an ALJ who is not a medical expert will subjectively arrive at an index of traits which he expects the claimant to manifest at the hearing. If the claimant falls short of this index, the claim is denied." *Id.*

Here, the ALJ stated that Plaintiff was able to participate in the hearing without signs of obvious pain or discomfort. [R. 20]. However, "the ALJ may consider a claimant's demeanor among other criteria in making credibility determinations." *Norris v. Heckler*, 760 F.2d 1154, 1158 (11th Cir. 1985). The simple fact that the ALJ considered Plaintiff's demeanor during the hearing does not mean that the ALJ committed any error so long as the ALJ does "not impose his

observations in lieu of a consideration of the medical evidence presented." *Id.* In this case, the ALJ explained in detail in his decision how Plaintiff's subjective complaints were at odds with the objective findings on examination and properly considered the medical evidence. [R. 18-21]. Thus, reversal of the ALJ's decision would be improper. *See Escobedo v. Astrue*, No. 08-CV-61640, 2009 WL 2905732, (S.D. Fla. Sept. 10, 2009) ("Based on the minimal weight assigned to the plaintiff's observed behavior at the hearing, the undersigned finds that the ALJ did not base his determination on the type of 'sit and squirm' jurisprudence condemned by *Freeman, supra.*").

Finally, as to verifiability of Plaintiff's activities of daily living, the ALJ considered this as one factor in determining that Plaintiff's "reported limited daily activities are considered to be outweighed by the other factors discussed in this decision." [R. 21]. Although the Eleventh Circuit has not spoken as to objective verification of daily activities, the Tenth Circuit has "held that the lack of objective verification about a claimant's allegedly limited daily activities is a proper factor in a credibility analysis." *Pickup v. Colvin*, 606 Fed.Appx. 430, 434 (10th Cir. 2015). The ALJ also stated that, "even if [Plaintiff's] daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to [Plaintiff's] medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision." *Id.*

Considering this Court's deferential standard of review, substantial evidence exists in the record to support the ALJ's credibility finding.

### B. Whether the ALJ erred in rejecting the opinion of Dr. Palacio

Plaintiff contends that the ALJ erred by using an insufficient rationale in rejecting Dr. Palacio's opinion. [DE 26, p. 14]. Specifically, Plaintiff refers to the following reasoning

given for applying little weight to Dr. Palacio's opinion:

> [T]reatment records contemporaneous with this opinion describe unremarkable physical findings . . . The possibility exists that a doctor may express an opinion in an effort to assist a patient with whom he sympathizes for various reasons. Notably, it is also possible that a doctor may provide supportive notes or reports in order to satisfy patient requests and avoid unnecessary doctor/patient tension.

[R. 21; DE 26, p. 14]. Plaintiff argues that no treatment records were produced by Dr. Palacio, and as such, there is "no evidence that he had a special relationship with Plaintiff, or that he was trying to placate his patient." [DE 26, p. 14]. Notably, Plaintiff concedes that "the record is silent as to whether Dr. Palacio was the treating provider, or even an examining provider[.]" *Id.* Thus, Plaintiff asserts that the ALJ's reasoning is pre-formatted language not applicable to her case and not supported by substantial evidence, mandating reversal. *Id.* Plaintiff also cites her MRIs demonstrating slipped discs, disc herniation, and bulging discs that support Dr. Palacio's opinion that Plaintiff is limited to never pushing, pulling, or overhead lifting and that her condition would require her to be absent from work for more than four days per month. [DE 26, p. 15].

Further, Plaintiff argues that the ALJ erred in accepting the opinion of Dr. Patty, the non-examining State agency physician, because the opinion was rendered prior to Dr. Palacio's assessment of Plaintiff. *Id.* Plaintiff asserts that the ALJ's reasoning that the opinion was "generally consistent with the evidence available in this case" was insufficient rationale to justify acceptance of a non-examining source's opinion. [DE 31, p. 6]. Further, Plaintiff notes that "Dr. Patty's opinion is silent on manipulative and reaching limitations[,]" and that the ALJ's included limitation of overhead reaching for one side is not consistent with "the medical record that documents Plaintiff's difficulty with both shoulders, and does not imply that the only direction in which range of motion is limited is overhead." [DE 26, p. 16].

Defendant contends that the ALJ did not err in assigning little weight to Dr. Palacio's opinion because the opinion "substantially departed from the medical record." [DE 29, p. 18]. Specifically, Defendant notes negative imaging studies, normal gait and neurological functions, and improvement in symptoms that the ALJ took into consideration when considering Dr. Palacio's opinion. *Id.* Defendant also asserts that the ALJ did not err in accepting Dr. Patty's opinion because it was supported by substantial evidence. [DE 29, p. 18-19]. Defendant argues that the ALJ properly reviewed the entire record in his determination, even if Dr. Patty did not review Dr. Palacio's opinion during his assessment. [DE 29, p. 19].

The Eleventh Circuit Court of Appeals has explained that an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion," but that the ALJ is required "to state with particularity the weight he gives to different medical opinions and the reasons why." *McCloud v. Barnhart*, 166 Fed.Appx. 410, 418-19 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)). The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). "Good cause" exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1241. If the ALJ decides to disregard the opinion of a treating physician, the ALJ must clearly articulate his or her reasons for doing so. *Id.*

The ALJ reviewed Dr. Palacio's opinion, which indicated that Plaintiff was limited to never pushing, pulling, or lifting overhead; that Plaintiff was likely to suffer from headaches, mood disturbances, radiating pain, anxiety, fatigue, and depression; and that Plaintiff's condition

31

would require her to be absent more than four times per month.  [R. 21, 271].  In rejecting Dr. Palacio's opinion on Plaintiff's limitations and potential symptoms, the ALJ cited "treatment records contemporaneous with this opinion" that described "unremarkable physical findings, as well as an absence of mental health complaints and increased activity with treatment."  [R. 21]. The ALJ went on to note that

> [t]he possibility exists that a doctor may express an opinion in an effort to assist a patient with whom he sympathizes for various reasons.  Notably, it is also possible that a doctor may provide supportive notes or reports in order to satisfy patient requests and avoid unnecessary doctor/patient tension.  While it is difficult to confirm such situations when the [sic] occur, they appear to be more likely when the physician opinion in question departs substantially from the remainder of the medical record, as is seen in the present case.  For the reasons articulated above, I give this opinion little weight, despite Dr. Palacios' [sic] status as the [Plaintiff]'s treating practitioner.

*Id.*

The ALJ cited nurse practitioner notes from American Care, the same clinic where Dr. Palacio practices, which indicate Plaintiff reported no pain in her joints or muscles, but only right shoulder pain, just two weeks after Dr. Palacio's opinion was submitted.  [R. 446].  Further, he cited records from one month prior to Dr. Palacio's opinion which demonstrate that Plaintiff reported that her pain was controlled with medication and Voltaren gel.  [R. 451].  By November 8, 2013, Plaintiff reported having no depression, and the month following she reported no pain or symptoms at all.  [R. 439-40].  Thus, despite Dr. Palacio's questionable status as Plaintiff's treating physician,[4] good cause was shown for the ALJ's decision to reject his opinion because the medical evidence supported a contrary finding and the ALJ did articulate adequate reasons giving Dr. Palacio's opinion little weight.

---

[4] The Court questions whether Dr. Palacio may be considered Plaintiff's treating physician.  As Plaintiff concedes, no treating records exist in the medical record.  [DE 26, p. 14].  The only record from Dr. Palacio is an RFC questionnaire prepared by Plaintiff's counsel.  [R. 270-72].  Further, Dr. Palacio's opinion is based only on the medical evidence provided to him, and not on his own examination of Plaintiff.  However, because neither party has raised this issue, the Court will not do so here.

Moreover, Dr. Palacio's opinion appears to have been retained only for purposes of securing social security disability benefits. When weighing opinion evidence, "[w]e will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability." 20 C.F.R. § 404.1527(a)(2).

With regard to Dr. Patty, the ALJ accepted his opinion because it was "generally consistent with the evidence available in the case." [R. 21]. The ALJ incorporated Dr. Patty's opinion into Plaintiff's RFC, limiting her to "light exertional level work, with additional postural limitations and right sided reaching limitations in deference to her spinal and right shoulder conditions, minimally documented by abnormal clinical and diagnostic findings." [R. 21-22]. He also limited Plaintiff to "simple communication in English" but did not accommodate her alleged mental impairment, finding no evidence that she suffered from a psychological condition. [R. 22].

The Court finds that the ALJ did not err in assigning more weight to the state examiner, Dr. Patty, because his opinion was "generally consistent with the evidence available[.]" [R. 21]. "Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion." 20 C.F.R. § 404.1527(c)(4). In his assessment of Plaintiff on October 5, 2012, Dr. Patty limited Plaintiff to occasionally lifting or carrying up to twenty pounds and noted relief from neck and low back pain with therapy and radiation. [R. 82]. This is consistent with a majority of the medical evidence of record, discussed *supra*. *See* R. 457-58, 452, 436-40. Further, the ALJ explicitly noted that he reviewed the entire record and that his RFC assessment was supported by the record, including objective findings and medical opinions. [R. 18, 22]. Thus, the ALJ did not commit error in assigning more

weight to Dr. Patty's opinion.

## IV.    CONCLUSION

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the decision of the Commissioner is **AFFIRMED**. Accordingly, Plaintiff's Motion for Summary Judgment with Supporting Memorandum of Law [DE 26] is hereby **DENIED**, and Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment [DE 29] is hereby **GRANTED**.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this _8th_ day of August, 2017.

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE